J-A10036-24

2024 PA Super 135

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| DEVAGHN HAWKINS-DAVENPORT | : | No. 798 EDA 2023 |

Appeal from the Order Entered February 21, 2023
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):  CP-51-CR-0005188-2021

BEFORE:  LAZARUS, P.J., PANELLA, P.J.E., and BECK, J.

OPINION BY PANELLA, P.J.E.:                    **FILED JULY 2, 2024**

The Commonwealth appeals from the Philadelphia County Court of Common Pleas' order granting Devaghn Hawkins-Davenport's motion to suppress the firearm police saw in plain view during a traffic stop as well as statements Hawkins-Davenport made during that stop. The Commonwealth primarily argues that one of the two officers who effectuated the traffic stop properly removed the firearm openly laying on the passenger seat of Hawkins-Davenport's vehicle for the officers' safety and the trial court erred by finding otherwise. Specifically, the Commonwealth contends the court erred by concluding the officer unlawfully removed the firearm without first knowing that Hawkins-Davenport illegally possessed the gun. We agree the trial court erred by granting Hawkins-Davenport's motion to suppress the firearm and the statements he made to police. We therefore reverse.

Hawkins-Davenport was charged with, *inter alia*, firearms not to be carried without a license after Officers Gregory McCabe and Joshua Torres of the Philadelphia Police Department secured a firearm laying on the front passenger seat in his vehicle during a traffic stop. Hawkins-Davenport openly admitted during the traffic stop that he did not have a license to carry the firearm.

He eventually filed a suppression motion alleging a wide range of violations of his constitutional rights, many not applicable to the facts of this case. However, among its many claims, the suppression motion did generally allege the police did not have sufficient grounds to search Hawkins-Davenport's vehicle and recover the firearm from the vehicle, the statements Hawkins-Davenport gave to police were the fruit of that illegal search, and he did not properly waive his **Miranda** rights. **See** Omnibus Pre-Trial Motion for Suppression, 11/15/2021, 1-3 (unpaginated).

The trial court held a hearing on the motion. At the hearing, Hawkins-Davenport clarified the grounds on which his suppression motion was based. Specifically, he asserted the police did not have reasonable suspicion to stop his vehicle. **See** N.T., 2/21/2023, at 4, 35. He also claimed there was not sufficient cause to search his vehicle and recover the firearm and that any statements made to police were the fruit of that illegal search. He further maintained he had not knowingly waived his **Miranda** rights prior to a statement he eventually gave to detectives at the police station following his

arrest. *See id.* at 4-5. Hawkins-Davenport was therefore seeking to suppress the firearm the officers saw in the car and any statements he made to police. *See id.*

At the hearing, the Commonwealth called Officer McCabe to the stand. Officer McCabe reported he and his partner, Officer Torres, were on patrol on August 19, 2020, in Philadelphia, when they pulled Hawkins-Davenport over because the brake light on the driver's side of his vehicle was not working. *See id.* at 8. Officer McCabe testified he approached the driver's side window and asked Hawkins-Davenport to lower the vehicle's windows because they were heavily tinted. *See id.* at 11. After Hawkins-Davenport lowered the vehicle's windows, the officer asked Hawkins-Davenport for his license, registration and insurance, which Hawkins-Davenport produced. *See id.* at 8, 11.

Officer McCabe confirmed he was wearing a body-worn camera at the time of the stop and the footage from the stop was played for the court. *See id.* at 8-13.[1] When defense counsel asked Officer McCabe if the video was "an accurate representation of what you saw on that day at the rear of the

_____

[1] The camera is activated as the officer is getting out of his vehicle to approach Hawkins-Davenport's stopped vehicle. The first minute of the video has footage with no audio, with the audio activated at approximately the one-minute mark of the video. *See* Ex 1 USB; N.T., 2/21/2023, at 10. Officer McCabe indicated it is standard for there to be a delay after the camera is activated before the audio also comes on. *See* N.T., 2/21/2023, at 10.

- 3 -

vehicle," the officer replied that it was not "because the vehicle [was now] in park." *Id.* at 14.

Officer McCabe also testified that after he approached the driver's side of the vehicle and asked Hawkins-Davenport for his information, Officer Torres approached the passenger side of the vehicle and saw a firearm through the open window. *See id.* at 8.[2]

Officer Torres then took the stand and elaborated on his role in the stop. He reiterated he and Officer McCabe pulled Hawkins-Davenport over because the driver's side brake light on Hawkins-Davenport's vehicle was not working. *See id.* at 20. He also reiterated that Officer McCabe asked Hawkins-Davenport to lower the vehicle's windows because they were tinted. *See id.* Officer Torres stated he approached the passenger side of the vehicle as Officer McCabe was gathering Hawkins-Davenport's papers. *See id.* At that point, Officer Torres came to the open front passenger window and saw a gun laying on the front passenger's seat of the vehicle. *See id.*

Officer Torres confirmed he was also wearing a body-worn camera at the time of the stop. *See id.* at 20-21. The Commonwealth played the footage from his camera. As the video played, Officer Torres testified that as his partner was engaging with Hawkins-Davenport he "observed a gun, uncovered, completely in plain sight, on [Hawkins-Davenport's] passenger's

_____

[2] The video reflects the middle console of Hawkins-Davenport's vehicle appears to be blocking Officer McCabe's view of the gun.

seat." *Id.* at 22. According to Officer Torres, he asked Hawkins-Davenport if he had a license to carry and Hawkins-Davenport responded he did not. *Id.* at 23. The officer then "recovered the weapon for our safety and proceeded to ask him [again] if he had a license to carry, [to] which he replied no." *Id.*[3]

On cross-examination, defense counsel showed Officer Torres the investigation report he had completed about the incident. Defense counsel read the portion from the report that recounted Officer Torres stating he had approached the passenger side of the vehicle, observed the firearm in plain sight and "grabbed the weapon right away." N.T., 2/21/2023, at 25. According to the report, Officer Torres then asked Hawkins-Davenport if he had a permit to carry the gun, to which Hawkins-Davenport replied he did not. *See id.* at 25-26. Hawkins-Davenport was then placed under arrest.

Hawkins-Davenport testified at the hearing in his own defense. He represented that his driver's side brake light was functional on August 19, 2020. *See id.* at 32. He also testified the officers removed his firearm before asking him whether he had a license to carry it. *See id.* at 33.

---

[3] Again, as with the video footage from Officer McCabe's body camera, the first minute of the video footage from Officer Torres's body camera has footage with no audio, with the audio activated at approximately the one-minute mark of the video. *See* Ex 1 USB. The audio begins a few seconds after Officer Torres has taken the firearm from the front passenger seat and with Officer Torres asking Hawkins-Davenport "and you don't have a license for it?" and Hawkins-Davenport candidly admitting he did not. *See id.*

During argument, defense counsel maintained there was no reasonable suspicion to stop Hawkins-Davenport's vehicle because, according to defense counsel, the body-worn camera footage reflected that the brake light in question was functional. ***See id.*** at 35. He also argued the firearm was illegally seized because Officer Torres did not ask Hawkins-Davenport if he had a license to carry before he seized the weapon. ***See id.*** at 38. According to defense counsel, Hawkins-Davenport did not make any motion towards the firearm or do anything to indicate that, although he was clearly armed, he was also dangerous. ***See id.*** at 46-47. Defense counsel further maintained any statements made by Hawkins-Davenport were the fruit of this illegal stop and seizure and the statements made by Hawkins-Davenport after his arrest and at the police station were unlawful as he had not knowingly waived his ***Miranda*** rights. ***See id.*** at 39.

The Commonwealth began its argument by countering there was reasonable suspicion to stop the vehicle. The court interrupted counsel and stated "I find the officer had reasonable suspicion. It's the recovery of the firearm that you need to discuss." ***Id.*** at 41. The Commonwealth took heed and proceeded to argue Officer Torres properly removed the firearm, which the officer saw in plain view and was within Hawkins-Davenport's reach during a lawful stop, to protect the officers' safety. ***Id.*** at 45 ("For everyone's safety, it makes sense to secure the firearm before proceeding [with the traffic stop.]").

The trial court granted the suppression motion. In doing so, the court reiterated it was finding the traffic stop was legal but was nonetheless excluding the firearm. *See id.* at 48. The court explained that, although Officer Torres testified that he asked Hawkins-Davenport whether he had a permit to carry the gun before seizing the gun, the investigation report provided that the officer did not ask the question until after he seized the gun. *See id.* at 48. The court then stated there was no evidence that Hawkins-Davenport was reaching towards the gun, so there was "no evidence of danger" to the officers, and the officers therefore illegally seized the gun. *Id.* The court also ruled it was excluding statements based on its finding that Hawkins-Davenport did not knowingly waive his *Miranda* rights. *See id.* at 48-49. An order granting the suppression motion was entered the following day, February 22, 2023.

The Commonwealth filed a notice of appeal, certifying the court's suppression order would substantially handicap the prosecution of its case pursuant to Pa.R.A.P. 311(d). The Commonwealth also complied with the trial court's directive to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal.

In its responsive opinion, the trial court urged this Court to find it had properly granted the suppression motion. The trial court reiterated it had determined, as a finding of fact, that Officer Torres had only asked Hawkins-Davenport if he had a license to carry after he removed the firearm from the vehicle. The court acknowledged the officer's testimony that he also asked the

licensure question before removing the firearm but explained it had given more weight to the investigation report, which the court found provided otherwise.

The trial court then determined that, pursuant to **Commonwealth v. Hicks**, 208 A.3d 916 (Pa. 2019), the officer had improperly removed the firearm from the car before ascertaining that Hawkins-Davenport did not have a license to carry the firearm. This is because, the court reasoned, under **Hicks**, possession of a firearm alone is not sufficient to create reasonable suspicion of criminal activity given that carrying a concealed firearm with a valid license is lawful conduct. **See Hicks**, 208 A.3d at 937 (holding that mere possession of a firearm did not establish reasonable suspicion to allow a police officer to approach and detain a person in order to investigate whether the person had a license to carry the firearm).

The court found that, other than carrying and having access to the firearm, Hawkins-Davenport did nothing to show he posed any threat to the officers. Instead, the court explained, he complied with Officer McCabe's request for his papers, was cooperative and did not make any motion towards the firearm. As such, the trial court opined that it had properly concluded the police illegally seized the firearm, mandating its suppression, and urged this Court to find the same.

The Commonwealth, clearly, urges this Court to reach the contrary conclusion and find the trial court erred in suppressing the firearm. The

Commonwealth contends the officers' actions here did not violate Hawkins-Davenport's right to be free from unreasonable searches and seizures under the Fourth Amendment to the United States Constitution or Article I, Section 8 of the Pennsylvania Constitution. To that end, it raises these two issues for our review:

> I. Did the lower court err by suppressing a firearm that police properly seized as a safety precaution from the seat beside [Hawkins-Davenport] during a lawful traffic stop?
>
> II. Did the lower court err insofar as it suppressed statements that [Hawkins-Davenport] made during the lawful traffic stop?

Commonwealth's Brief at 3 (lower court's answers omitted).

When this Court reviews an appeal from a suppression court's order, we may only consider the evidence produced at the suppression hearing. *See* ***Commonwealth v. Barr***, 266 A.3d 25, 39 (Pa. 2021). We must determine, in the first instance, whether the suppression court's factual findings are supported by the record and if they are, we are bound to those findings. ***See id.*** "When the suppression court's [ ] factual findings are unannounced, or there is a gap in the findings, the appellate court should consider only the evidence of the prevailing party [ ] and the evidence of the other party [ ] that, when read in the context of the entire record, remains uncontradicted." ***Commonwealth v. Millner***, 888 A.2d 680, 685 (Pa. 2005) (citation omitted).

Moreover, the suppression court, as factfinder, has the exclusive ability to pass on the credibility of witnesses. ***See Commonwealth v. Fudge***, 213

A.3d 321, 326 (Pa. Super. 2019). We will therefore "not disturb a suppression court's credibility determination[s] absent a clear and manifest error." *Id.* (citation omitted).

We must also determine whether the legal conclusions the suppression court drew from its factual findings are correct. *See Barr,* 266 A.3d at 39. Unlike the deference we give to the suppression court's factual findings, "we maintain *de novo* review over the suppression court's legal conclusions." *Commonwealth v. Brown*, 996 A.2d 473, 476 (Pa. 2010) (citation omitted).

The Commonwealth begins its argument by stating that "[a]s an initial matter, there is no question that the stop of the car was appropriate. [Hawkins-Davenport] was driving without a functioning driver's side brake light." Commonwealth's Brief at 10. To be sure, the Commonwealth points out, the trial court specifically stated in its opinion that it had found "there existed reasonable suspicion to stop [Hawkins-Davenport's] vehicle, and this issue is not presently disputed." Trial Court Opinion, 7/11/2023, at 4 n.5.

Hawkins-Davenport takes issue with this and asserts the legality of the stop is in dispute in that he continues to argue there was not sufficient cause to stop his vehicle. To that end, Hawkins-Davenport maintains the trial court never specifically found as a fact that Hawkins-Davenport's brake light was not functioning, stating only that the officers stopped him due to an "alleged malfunctioning taillight." *Id.* at 1. He asserts the video of Officer McCabe's body-worn camera supports Hawkins-Davenport's testimony that the brake

light was functional. According to Hawkins-Davenport, because there was conflicting evidence on whether the brake light was working, "this Court [,under the applicable standard of review,] must conclude that the brake light was functional." Appellant's Brief at 14.

We disagree. Instead, we find it is entirely reasonable to conclude from the suppression hearing's notes of testimony as well as the trial court's Rule 1925(a) opinion that the trial court found the brake light was not functional and the officers therefore initiated a legal traffic stop. The officers both testified that they stopped the vehicle because they observed that the vehicle's brake light was not working, testimony that the trial court specifically cited to in its opinion. *See* Trial Court Opinion, 7/11/2023, at 1. The video from the officers' body-worn cameras, which Hawkins-Davenport insists shows a working driver's side brake light, was shown to the trial court. Following the testimony and evidence presented, the trial court stated in no uncertain terms that it was finding the officers conducted a valid and legal traffic stop.

Based on the record as a whole, we find the trial court grounded its conclusion that the officers conducted a valid traffic stop on its finding that the brake light was malfunctioning. As stated above, we are bound by those findings of fact made by the suppression court that are supported by the

record.[4] We therefore find no error in the trial court's legal conclusion that the traffic stop was lawful. *See* 75 Pa.C.S.A. § 4303(b); ***Commonwealth v. Holmes***, 14 A.3d 89, 95 (Pa. 2011) (stating that a police officer may conduct a vehicle stop if there is reasonable suspicion that a violation of the Motor Vehicle Code has occurred).[5]

We therefore turn to the Commonwealth's first issue on appeal, that is, the trial court erred by suppressing the firearm the officers found in plain view on the passenger seat of Hawkins-Davenport's vehicle during the lawful traffic

_____

[4] Hawkins-Davenport argues the trial court failed to make a finding of fact regarding the functionality of the brake light. However, to the extent Hawkins-Davenport's argument could be read as averring that any finding of fact by the suppression court that the brake light was not working is not supported by a record with a video clearly showing otherwise, we reject such an argument. Both Officer McCabe and Officer Torres testified that Hawkins-Davenport's brake light was not functioning and that is why they stopped his vehicle. Moreover, we have reviewed the video and do not agree with Hawkins-Devenport that it definitively establishes that the driver's side brake light of Hawkins-Davenport's vehicle was not malfunctioning while he was driving the vehicle as the officers testified.

[5] Hawkins-Davenport now argues the police needed probable cause to stop his vehicle because a broken brake light does not require any further investigation regarding whether a Motor Vehicle Code violation has occurred. He did not make this argument at the suppression hearing and the issue is arguably waived. *See* Pa.R.A.P. 302(a) (providing that "issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). Even assuming the issue is properly before the Court and that probable cause was needed, the officers testified they observed the brake light not working, which would give them probable cause of a Motor Vehicle Code violation. ***See Commonwealth v. Malloy***, 257 A.3d 142, 148-149 (Pa. Super. 2021) (stating that the officer's observation that Malloy's vehicle did not have a properly displayed license plate provided probable cause to believe the stopped vehicle was in violation of Motor Vehicle Code).

stop. The Commonwealth acknowledges at the outset, as do we, that the trial court found that Officer Torres only asked Hawkins-Davenport if he was licensed to carry the gun after seizing the gun and not before, and because the record supports that finding, we are bound by it. The Commonwealth maintains that, even without knowing whether the firearm was illegally possessed, Officer Torres properly removed the firearm from Hawkins-Davenport's car for his and his partner's safety. It argues that when the officer saw the gun laying out in plain sight during the traffic stop it was entirely reasonable for the officer to remove it from the vehicle as not doing so would have jeopardized the officers' safety. We agree.

This case involves the constitutionality of actions taken by the police during a traffic stop, which is generally considered to be an investigative detention. *See Commonwealth v. Spence*, 290 A.3d 301, 314 (Pa. Super. 2023). "[A]n investigative detention, by implication, carries an official compulsion to stop and respond, but the detention is temporary, unless it results in the formation of probable cause for arrest[.]" *Id.* (citation omitted).

The "mission" of a traffic stop is "to address the traffic violation" underlying the stop as well as to "attend to related safety concerns." *Commonwealth v. Ross*, 297 A.3d 787, 792 (Pa. Super. 2023) (citation omitted). An officer's mission includes "inquiries incident to the traffic stop[,] such as checking the driver's license," registration and insurance and

determining whether the driver has any outstanding warrants. *Id.* (citation omitted). Importantly:

> [T]asks relating to officer safety are also part of a traffic stop's mission when done purely in an interest to protect the officers. This safety interest stems from the fact that traffic stops are especially fraught with danger to police officers, so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely.

*Id.* at 792-793 (quotation marks and citations omitted).

As such, there are certain "actions police officers may undertake during a lawful traffic stop based solely on concerns for their safety and security and without independent justification or cause." *Id.* at 798. The legality of these actions involves the balancing of the public interest in ensuring the safety of police officers against an "individual's right to personal security free from arbitrary interference by law officers." *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (citation omitted). In balancing those interests, precedent has established, for example, that an "officer may order the driver of a vehicle to exit the vehicle until the traffic stop is completed, even absent a reasonable suspicion that criminal activity is afoot." *Commonwealth v. Wright*, 224 A.3d 1104, 1109 (Pa. Super. 2019) (citations, ellipses and brackets omitted). It has also established that, to protect their own safety, officers may also ask drivers whether they have a weapon as a matter of course during a traffic stop. *See Commonwealth v. Clinton*, 905 A.2d 1026, 1031 (Pa. Super. 2006) (stating that asking of such question unquestionably falls on the side of officer safety); *Ross*, 297 A.3d at 793.

- 14 -

In **Ross**, this Court examined the propriety of the suppression of a firearm removed from a vehicle after the police asked Ross, the driver of a vehicle pulled over for a traffic stop, if there were a firearm in the car and Ross responded that there was. There, two Philadelphia police officers stopped Ross's vehicle because it did not have an operable break light. While running Ross's information, Officer Gregory Kotchi discovered that Ross had a revoked license to carry a firearm. **See Ross**, 297 A3d at 790. Concerned that Ross possessed a firearm in the vehicle, Officer Kotchi returned to the vehicle and asked Ross if had a firearm. **See id.** Ross replied that he had a firearm on his hip. **See id.** Officer Kotchi told Ross that his partner, Officer Lewis Armstrong, who was on the passenger side of the vehicle, was going to remove the firearm. Ross raised his hands and Officer Armstrong opened the passenger door and removed the firearm from Ross's hip. **See id.** Ross was arrested.

Ross filed a motion to suppress the firearm, which the suppression court granted. The court found that the question about the presence of a firearm constituted a separate investigation from the traffic stop and that the police officer had not asked about the firearm because he felt unsafe. **See id.** at 790-791. The court therefore found the police had illegally seized the firearm and ordered its suppression.

On appeal, this Court reversed. We held that Officer Kotchi did not initiate a new investigation during the traffic stop when he asked Ross about the presence of weapons but rather, posed this question while the traffic stop

was ongoing. *See id.* at 795. As such, *Ross* held the officer properly asked Ross whether he had a firearm as a means of ensuring his and his partner's safety during the course of the traffic stop. *See id.* The Court explained:

> [A]lthough the trial court indicate[d] that the officers could not have felt unsafe, we conclude a reasonable officer, under these factual circumstances, would believe his and his partner's safety was at issue and could inquire about a firearm. Significantly, when Officer Kotchi learned about the revoked firearms license, Officer Armstrong was standing outside Ross's vehicle and unaware of the possible firearm and Officer Kotchi still possessed Ross's driver's license and had to return it. Officer Kotchi explicitly testified that in his experience, people who applied for a firearm permit generally carry a firearm, and that he was concerned that the possession of a firearm by Ross could endanger him or Officer Armstrong. Therefore, based upon information available to Officer Kotchi, he had a reasonable belief that his safety or the safety of [his partner] was in danger.

*Id.* at 796 (citations omitted).

Based on the officer's legitimate concern Ross had a firearm in the car, therefore putting the officers' safety at risk, we held that the officers properly asked about the presence of a firearm and, by logical extension, removed the firearm for their safety. *See id.* at 795, 797-798. We then stated:

> It bears emphasizing that balancing the constitutional rights of motorists, the public protection objectives, and police officer safety is difficult, especially in the context of rapidly evolving traffic stops. One particular concern for officers during a traffic stop is the proliferation of guns, including the substantial increase in the number of people possessing firearms, the rise in mass shootings, and the ability to carry a concealed weapon in vehicles in Pennsylvania. Clearly, neither the United States Constitution nor the Pennsylvania Constitution require officers to gamble with their personal safety during traffic stops. Therefore, in the context of traffic stops, police officers may take reasonable precautions when the circumstances give rise to legitimate safety concerns.

- 16 -

*Ross*, 297 A.3d at 797-798 (citations and footnote omitted).

We now find that police officers may, as a reasonable precaution for their safety, remove a firearm they see in plain view that is accessible by the driver, during an ongoing valid traffic stop as a matter of course. In these circumstances, there is no need to ask whether the driver is armed because the sighting of the firearm in plain view has negated any need for that question. We have no difficulty in finding that the sighting of the gun in the circumstances presented by this incident "[gave] rise to legitimate safety concerns" and the removal of such a firearm was a reasonable precaution to protect the officers' safety. *Id.* at 798.

In concluding otherwise, the trial court essentially found that the sighting of the gun did not give rise to legitimate safety concerns because Hawkins-Davenport was cooperative and did not make any movements towards the gun. However, the *Ross* Court clearly contemplated that the mere presence of a firearm during a traffic stop can reasonably lead an officer to believe his safety is at risk. As explained above, the *Ross* Court held that the officers had a reasonable belief that their safety was in danger once they discovered Ross had a revoked firearms license, which led them to believe Ross could possibly have a firearm in the car. As such, the officers lawfully asked if Ross had a gun and then lawfully secured that gun once Ross answered in the affirmative.

Here, Officer Torres saw a firearm sitting on the front seat of the car. He and his partner were standing on either side of the stopped car. The gun was within the reach of Hawkins-Davenport. In these circumstances, the officers clearly had legitimate reason to believe their safety may be at risk. To find otherwise would be to ignore the reality of our country, with the proliferation of guns on our streets and the fact that "a significant percentage of murders of police officers occurs when the officers are making traffic stops." *Mimms*, 434 U.S. at 110 (citation omitted).

To be clear, we also find that the removal of the gun seen in plain sight was a reasonable precaution to protect Officer Torres's legitimate concern for his and his partner's safety. Undoubtedly, cases such as *Clinton* and *Ross* did not contemplate that an officer could ask about the presence of firearms in warranted situations, but not take safety precautions, like securing the firearm, for the duration of the traffic stop should the driver affirm he has a firearm at his command. "We think it too plain for argument that the [Commonwealth's] proffered justification—the safety of the officer—is both legitimate and weighty." *Mimms*, 434 U.S. at 110. At the same time, temporarily securing the gun in these circumstances, even if the firearm is lawfully possessed, is not a "serious intrusion upon the sanctity of the person" nor is it an "arbitrary interference by law officers." *Id.* at 109, 111 (citations omitted). Rather, it is a "negligibly burdensome precaution" taken so the

officer may "complete his mission safely." **Ross**, 297 A.3d at 793 (citations omitted).

On balance, then, we find that any intrusion imposed by the seizure of a gun while police continue their traffic investigation must give way to the clear risk posed by a driver having access to a firearm during a traffic stop that is already known to teem with potential danger. As such, we conclude the removal of the gun in situations such as the one here is one of the "actions the police may undertake during a lawful traffic stop based solely on concerns for safety and security and without independent justification or cause." **Id.** at 798 (citations omitted).

Although inherent in such a finding, we now make explicit that Officer Torres and other police officers in like situations do not need to ascertain that the driver illegally possesses the firearm observed in plain view during a lawful traffic stop before securing it for their protection. In concluding otherwise, the trial court found Officer Torres illegally seized the gun because, under **Hicks,** the officer did not have reasonable suspicion to believe Hawkins-Davenport had engaged in criminal activity simply by observing a firearm that Hawkins-Davenport could have legally possessed. The court explained that the officer only asked Hawkins-Davenport if he had a license to carry after he secured the gun, so he was unaware at the time he removed the gun from Hawkins-Davenport's reach that Hawkins-Davenport did not legally possess it.

However, as explained above, Officer Torres removed the firearm as a safety precaution to protect himself and his partner during a valid traffic stop. He did not need any additional justification or cause to support the removal of the firearm beyond the fact that he was removing the firearm for the precautionary purpose of officer safety. Clearly, this safety justification is applicable to a firearm regardless of the possessor's licensure status. There is no doubt a firearm can be used to harm a police officer during a traffic stop whether it is legally possessed or not. As the Commonwealth cogently argues:

> [When the police stop a person for a Motor Vehicle Code violation and discover a deadly weapon], a potential threat to the well-being of the officers is obvious and avoidable regardless of whether it might ultimately turn out that the weapon was lawfully possessed. *See Michigan v. Long*, 463 U.S.[1032,] 1052 n.16 [(1983)] ("[W]e have expressly rejected the view that the validity of a *Terry* search depends on whether the weapon is possessed in accordance with state law.").

> [T]emporarily taking control of the weapon[, regardless of whether it is legally or illegally in the driver's possession,] is not only reasonable but essential. *See* [ ] *Ross*, 297 A.3d at 797 (explaining that *Hicks* does not restrict protective actions by police once a stop is initiated for a valid reason)[.]

Commonwealth's Brief at 15 (some citations and footnote omitted) (single paragraph divided into two paragraphs). We agree that a police officer is not required to ascertain whether a firearm is illegally owned before removing that firearm from the driver's reach in order to ensure the officer's safety as he proceeds with the investigative stop.

We also find that *Hicks* is, in any event, inapposite. In *Hicks*, our Supreme Court held that an officer cannot initiate an investigative stop based

- 20 -

on an individual's mere possession of a firearm. Here, in contrast, the police did not stop Hawkins-Davenport on the basis that he was armed; rather, they stopped him because of a Motor Vehicle Code violation. Moreover, **Hicks** cautioned that it "offer[ed] no opinion as to whether a police officer who has effectuated a lawful investigative detention may treat the suspect's possession of a firearm as *per se* authorization to 'frisk' the detainee." **Hicks**, 208 A.3d at 934. Officers McCabe and Torres did not frisk Hawkins-Davenport. Rather, Officer Torres saw a gun in plain sight on the front passenger seat and secured it for his and his partner's safety.

Hawkins-Davenport argues, however, that the police did conduct a frisk of his vehicle when they seized the firearm and did so improperly because they lacked reasonable suspicion that Hawkins-Davenport was armed and dangerous. Hawkins-Davenport claims Officer Torres could not reasonably suspect Hawkins-Davenport was dangerous given that he did not move towards the gun and, according to Hawkins-Davenport, a driver pulled over for a traffic stop is not necessarily dangerous simply because he is armed. We disagree.

Again, Officer Torres saw a gun in plain sight on the front passenger seat of the vehicle. Once he saw the gun, the officer reached in through an open window to retrieve the gun, as he was entitled to do as a safety precaution without any further justification or cause. While it may be true that

Hawkins-Davenport did not make any movement towards the firearm, the

Commonwealth responds:

> That was cold comfort. The danger remained that [Hawkins-Davenport] might proceed to do so, particularly if Officer Torres had immediately asked if he was unlicensed as defense counsel insisted the officer should have done. [**See** N.T., 2/21/2023, at 38;] **Arizona v. Johnson**, 555 U.S. 323, 331 (2009) ("the risk of a violent encounter in a traffic-stop setting stems … from the fact that evidence of a more serious crime might be uncovered during the stop") (quotation omitted). The officer was not obliged to cross his fingers and hope that things would not take a turn for the worse as the stop progressed.

Commonwealth's Brief at 16-17.

We agree. **See Mimms**, 434 U.S. at 112 (holding that the bulge in the driver's jacket "permitted the officer to conclude that [the driver] was armed and thus posed a serious and present danger to the safety of the officer"). Officer Torres properly removed the firearm he saw in plain sight so that it was not accessible to Hawkins-Davenport during the valid traffic stop in order to protect his and his partner's safety.

We note this case does not involve an allegation that the police impermissibly extended the traffic stop to ascertain the status of Hawkins-Davenport's concealed carry licensure, such as in **Malloy**, which was discussed at length at the hearing on Hawkins-Davenport's suppression motion. **See** N.T., 2/21/2023, at 41-46. Nor would we find that to be the case even in the face of such an allegation.

In **Malloy**, a police officer stopped a vehicle for a missing license plate, but the driver ultimately provided documentation showing he had recently

bought the car. ***See Malloy***, 257 A.3d at 145, 151. The officer asked Malloy, a rear-seat passenger in the vehicle, for identification, and then asked him if he possessed a firearm. ***See id.*** at 145, 151-152. Malloy stated that he did. The officer then secured the firearm for his safety and the safety of the other occupants of the car. ***See id***. at 145.

The officer asked Malloy whether he had a license to carry the firearm and Malloy gave the officer an expired "Act 235" card, which authorizes certain individuals to carry a firearm for their employment. ***See id.*** at 146, 146 n.1, 152. The officer then spent the next 15 to 20 minutes determining whether Malloy was in lawful possession of the gun. ***See id.*** at 146. After he determined he was not, the officer arrested Malloy. ***See id.***

Malloy filed a suppression motion, arguing the officer improperly prolonged the traffic stop to investigate whether he lawfully possessed the firearm. ***See id.*** The suppression court denied the motion. On appeal, this Court reversed. The issue in ***Malloy*** was not the questioning of the presence of weapons in the stopped vehicle or the removal of the gun for the officer's safety but rather, the continued detainment caused by the officer's investigation into Malloy's gun licensure status. The ***Malloy*** Court held the officer had unlawfully prolonged the traffic stop, stating that once the officer had properly secured the firearm for safety purposes, even a "10 to 15-minute extension of a routine traffic stop for the investigation of a secondary criminal matter" was not constitutionally permissible. ***Id.*** at 153.

*Malloy* is readily distinguishable from this case. The events in this traffic stop happened in quick succession. Officer McCabe approached Hawkins-Davenport's car and while the officer was gathering Hawkins-Davenport's information and before he was able to check the information, Officer Torres saw the firearm out in the open, removed the firearm through the open passenger side window, and asked Hawkins-Davenport within seconds if he had a permit to carry the gun. Hawkins-Davenport replied immediately that he did not. Officer McCabe ordered Hawkins-Davenport to step out of the vehicle and he placed him under arrest. Unlike the officer in *Malloy*, Officer Torres did not initiate a separate and prolonged investigation into whether Hawkins-Davenport possessed documents permitting him to carry a firearm.

Given the clear factual distinction of *Malloy* from this case, *Malloy* does not alter our conclusion that the officers' removal of the firearm from Hawkins-Davenport's vehicle was constitutionally permissible. In conclusion on this issue, we find that the trial court erred in suppressing the firearm.

The Commonwealth's second issue addresses the statements made by Hawkins-Davenport to the police. The Commonwealth asserts the trial court erred insofar as it suppressed statements Hawkins-Davenport made during the lawful traffic stop, *i.e.* that he did not have a license to carry the firearm seen in plain view by Officer Torres. The Commonwealth explains:

> The Commonwealth [ ] raised the issue of whether "statements [Hawkins-Davenport] made *during the lawful stop*" should have been suppressed. Rule 1925(b) Statement (emphasis added). But the lower court did not address that issue either at

the suppression hearing or in its opinion. Rather, the court opined that a subsequent statement [Hawkins-Davenport] gave to detectives at the police district after receiving **Miranda** warnings was inadmissible. [**See** Trial Court] Opinion[, 7/11/2023,] at 7-8. For present purposes, the Commonwealth will assume *arguendo* that the lower court was correct in that respect, and that [Hawkins-Davenport's] waiver in response to those warnings was not knowing and voluntary as required. **See generally Miranda v. Arizona**, 384 U.S. 436 (1966). Therefore, the Commonwealth will not seek to use that statement at trial.

The question remains, however, whether [Hawkins-Davenport's] statements to Officer Torres at the time of the traffic stop were subject to suppression. [Hawkins-Davenport] alleged that they were the "fruit of the poisonous tree" because the underlying traffic stop and the seizure of the gun were purportedly illegal. [**See**] N.T.[, 2/21/2023, at] 4-5. For the reasons set forth [in the first issue], that was not the case. Thus, the taint argument fails.

\*\*\*

The relevant statements, like [Hawkins-Davenport's] gun, were not obtained in violation of his rights. Insofar as the lower court prohibited their use at trial, it erred as a matter of law.

Commonwealth's Brief at 17-18.

We agree. As we have already determined that the initial traffic stop and the removal of the gun were lawful, Hawkins-Davenport's statements to police that he did not have a license to carry the firearm during that lawful traffic stop and after the officer removed the gun should not have been suppressed on the basis that they were tainted.

In conclusion, we emphasize that our holding today is limited to the facts of this case. That is, when an officer sees a firearm in plain sight and within reach of the driver during a lawful traffic stop, the officer may remove

that firearm from the vehicle before ascertaining whether the driver has a license to carry the gun so that the officer may proceed with the traffic stop safely.

Order reversed. Case remanded for further proceedings. Jurisdiction relinquished.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/2/2024