**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : No. 4 EAP 2025 |
| | : |
| Appellee | : Appeal from the Order of the |
| | : Superior Court entered on July 2, |
| | : 2024, at No. 798 EDA 2023, |
| v. | : reversing and remanding the Order |
| | : of the Philadelphia County Court of |
| | : Common Pleas, Criminal Division, |
| DEVAGHN HAWKINS-DAVENPORT, | : entered on February 21, 2023 at No. |
| | : CP-51-CR-0005188-2021. |
| Appellant | : |
| | : ARGUED: September 10, 2025 |

**OPINION**

**JUSTICE MUNDY**                               **DECIDED: February 18, 2026**

During a lawful traffic stop, a police officer seized a firearm in plain view. The driver, Devaghn Hawkins-Davenport ("Appellant"), was later charged with firearms not to be carried without a license and carrying firearms on public streets or public property in Philadelphia.[1] Appellant filed a pre-trial motion to suppress both the firearm and statements he made to law enforcement during the stop. After a hearing, the suppression court granted the motion suppressing both the firearm and statements. On appeal by the Commonwealth, the Superior Court reversed, *see Commonwealth v. Hawkins-Davenport*, 319 A.3d 537 (Pa. Super. 2024), and Appellant thereafter sought this Court's review. We granted allowance of appeal to consider whether, in Appellant's words, police may, "during a lawful traffic stop, frisk a car and seize a weapon in plain view where there

---

[1] *See* 18 Pa.C.S. §§ 6106, 6108.

is no evidence that the car's occupant is 'presently dangerous' other than his mere possession of the weapon[.]" *Commonwealth v. Hawkins-Davenport*, 333 A.3d 300 (Pa. 2025) (*per curiam*). For the reasons that follow, we affirm the order of the Superior Court.

## I. FACTS AND PROCEDURAL HISTORY

The relevant facts, as established at the February 21, 2023 suppression hearing, are undisputed.[2] On the evening of August 19, 2020, Officer Gregory McCabe and his partner, Officer Joshua Torres, were on duty in the City of Philadelphia when they observed a gray sport utility vehicle with an inoperable driver's side brake light. N.T., 2/21/23, at 6-8. Based on this observation, the pair initiated a traffic stop and eventually made contact with the driver, later identified as Appellant. *Id.* at 7.

Officer McCabe approached the driver's side and requested that Appellant lower his windows, as they were tinted to the point where the officers could not see inside and were unsure if there were any passengers in the vehicle. *Id.* at 11, 20. The officer also asked Appellant to provide his license, registration, and proof of insurance. *Id.* at 8. Concurrently, Officer Torres, following closely behind, approached the opposite side of the vehicle. *Id.* As he reached the lowered passenger's side window, Officer Torres motioned to his partner, *see id.* (Officer McCabe explaining that "I noticed [Officer Torres] was, like pointing down"), as he observed, in plain view, a gun lying on the front passenger's seat of Appellant's vehicle. *Id.* at 20. Officer Torres reached into the vehicle and recovered the firearm, while simultaneously asking Appellant twice in quick

---

[2] *See* Appellant's Brief at 2 ("The facts established at the suppression hearing are not disputed[.]"). As discussed *infra*, we are bound by the suppression court's factual findings when supported by the record. *See Commonwealth v. Cooley,* 118 A.3d 370, 373 (Pa. 2015).

succession whether he had a license to carry it.[3]  *Id.* at 22-23.  Appellant responded that he did not[4] and the officer, unsure whether the gun was loaded, "recovered the weapon for [] safety[,]" *see id.* at 23, resulting in Appellant's arrest and later, the filing of the aforementioned charges.

On November 15, 2021, Appellant filed a pre-trial motion to suppress, seeking to exclude, *inter alia*, the firearm that was recovered from the vehicle and statements made to police in conjunction with the vehicle stop.  *See, e.g.,* Motion to Suppress, 11/15/21, at 1 (unnumbered) ("[I]t violated [Appellant's] Pennsylvania and United States Constitutional rights as his personal stop and search was unlawful along with that of his vehicle. Reasonable suspicion and probable cause w[ere] lacking.").  At the suppression hearing, Appellant, through counsel, clarified that he was contesting the validity of the stop and alternatively, assuming *arguendo* that the stop was valid, whether the "probable cause or reasonable suspicion necessary to conduct any sort of frisk or to conduct a search" of the vehicle existed.  N.T., 2/21/23, at 4-5 (discussing *Commonwealth vs. Hicks*, 208 A.3d 916, 947 (Pa. 2019) (holding that the Superior Court erred in "concluding that the possession of a concealed firearm by an individual in public is sufficient to create a reasonable suspicion that the individual may be dangerous, such that an officer can approach the individual and briefly detain him in order to investigate whether the person is properly licensed" (citation and internal quotation marks omitted)).

---

[3] This exchange occurred within a minute of when the officers exited their patrol car and lasted only seconds.  *See* Commonwealth's Brief at 2-3.  *See also* N.T., 2/21/23, at 21-23.

[4] At the suppression hearing, Officer Torres testified that he asked first if Appellant had a license to carry and, upon receiving a response, recovered the firearm.  However, a report detailing the incident, created shortly after the vehicle stop, indicated that Officer Torres "reached in the vehicle and grabbed the weapon right away," before questioning Appellant about licensure.  *Id.* at 25-26.

The officers proceeded to testify consistent with the facts summarized above. Their body-worn camera footage, depicting their interactions with Appellant, was also entered into evidence. On cross-examination, the officers agreed that Appellant was cooperative during the traffic stop and made no furtive movements towards the passenger's seat. *See id.* at 15, 26. Appellant also testified on his own behalf, insisting that his taillight was functional on the day he was stopped by police and that the firearm was seized before he was asked if he has a license to carry it. *Id.* at 32-33.

After a brief on-the-record argument, the suppression court granted Appellant's motion. Although the court opined that the officers "had reasonable suspicion to stop the vehicle[,]" *see id.* at 40, it nevertheless found that suppression of the firearm was appropriate because: (1) during the stop, Appellant's "hands were facing up" and there was no indication that he was "reaching towards the passenger's side of the vehicle[;]" (2) there was "no evidence of danger to the officer[;]" (3) Appellant "gave Officer McCabe the documentation that was required[;]" and (4) per the investigative report, Officer Torres seized the weapon before he "asked the question about licensure." *Id.* at 47-48. The court also suppressed all statements Appellant made to police, including one to detectives at the police station, as it was unclear whether Appellant "was in his right mind at the time."[5] *Id.* at 48-49. The Commonwealth appealed, *see* Notice of Appeal, 3/20/23 (certifying, pursuant to Pa.R.A.P. 311(d),[6] that the court's suppression order terminated

---

[5] According to defense counsel, it was later discovered that Appellant was under the influence, which supposedly affected his "memory during the conversation." *See id.* at 39 ("There's another issue with the statement, which is that we have detectives going through it at a hundred miles an hour, not even asking if he understands those rights, not even ascertain[ing] if he's under the influence of anything, and as it later turns out, he is, and it seems to be affecting his memory during the conversation.").

[6] Pa.R.A.P. 311(d) provides that "[i]n a criminal case, under the circumstances provided by law, the Commonwealth may take an appeal as of right from an order that does not end the entire case where the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution." Pa.R.A.P. 311(d).

or substantially handicapped the prosecution), challenging the suppression of both the firearm and the statement made by Appellant during the traffic stop.[7]

In a subsequent opinion, the suppression court asked for the appellate court to affirm its suppression order. Suppression Ct. Op., 7/11/23, at 1. Of relevance, the court, relying on *Hicks, supra*, opined that "the officers [] lacked probable cause and reasonable suspicion to believe [Appellant] engaged in criminal activity and based their suspicions solely by observing" the firearm on the passenger seat. *Id.* at 6. The court further explained that it was "[o]nly after the recovery of the firearm [that] Officer Torres inquire[d] into whether [Appellant] had a license to carry," and "[s]ince possessing a concealed firearm cannot be used to infer criminal activity, and there existed no probable cause or reasonable suspicion to recover the firearm, the officers taking of the firearm constitute[d] an unjustified seizure in violation of [Appellant's] rights." *Id.*

In a published opinion authored by President Judge Emeritus Jack Panella, a unanimous panel of the Superior Court reversed the suppression court's order and remanded the matter for further proceedings. *See generally Hawkins-Davenport, supra*. To begin, the court engaged in a lengthy discussion of the relevant law. *See id.* at 543 (explaining that it "may only consider the evidence produced at the suppression hearing" and when the suppression court's factual findings are supported by the record, it is "bound to those findings" (citation omitted)); (noting that "[w]hen the suppression court's [ ] factual findings are unannounced, or there is a gap in the findings, the appellate court should consider only the evidence of the prevailing party [ ] and the evidence of the other party [

---

[7] The Commonwealth did not challenge the suppression of Appellant's statement made at the police station, instead focusing on the earlier disclosure to Officer Torres at the time of the traffic stop, *i.e.*, that he did not have a license to carry the firearm recovered. Unlike the station statement, which the suppression court addressed, the court did not explain its rationale for excluding this evidence. *See* Commonwealth's Brief to Superior Court at 17.

] that, when read in the context of the entire record, remains uncontradicted" (citation omitted) (other omissions in original)); (emphasizing that "the suppression court, as factfinder, has the exclusive ability to pass on the credibility of witnesses" and it will "not disturb a suppression court's credibility determination[s] absent a clear and manifest error" (citation omitted) (alterations in original)); (remarking that an appellate court maintains "*de novo* review over the suppression court's legal conclusions" (citation omitted)).

Considering these legal precepts alongside the parties' arguments, the intermediate court first addressed, and summarily dismissed, any challenge to the legality of the stop, as it found that "the [suppression] court grounded its conclusion that the officers conducted a valid traffic stop on its finding that the brake light was malfunctioning." *Id.* at 544. Turning to the first issue on appeal, *i.e.*, that the suppression court erred by suppressing the firearm recovered by the officers from the passenger seat of Appellant's vehicle, the panel agreed with the Commonwealth that "even without knowing whether the firearm was illegally possessed, Officer Torres properly removed the firearm from [Appellant's] car for his and his partner's safety." *Id.*

In so finding, the intermediate court cited, *inter alia*, *Commonwealth v. Ross,* 297 A.3d 787 (Pa. Super. 2023), a case in which a prior panel of that court described the "mission" of a traffic stop, in addition to explaining the importance of officer safety during such interactions.

> [T]asks relating to officer safety are also part of a traffic stop's mission when done purely in an interest to protect the officers. This safety interest stems from the fact that [t]raffic stops are especially fraught with danger to police officers, so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely.

*Ross*, 297 A.3d at 792-93 (citation and internal quotation marks omitted). Along these lines, the *Ross* court articulated the difference between "mission-related" questions posed

for, *inter alia*, officer safety, and those aimed at initiating a new investigation. *See id.* at 795 (finding that because it was a valid ongoing vehicle stop, the officer, for his and his partner's "safety, could inquire about the presence of weapons").

Based on its review of *Ross* and its awareness of some of the inherent dangers associated with traffic stops, the Superior Court determined that

> police officers may, as a reasonable precaution for their safety, remove a firearm they see in plain view that is accessible by the driver, during an ongoing valid traffic stop as a matter of course. In these circumstances, there is no need to ask whether the driver is armed because the sighting of the firearm in plain view has negated any need for that question. We have no difficulty in finding that the sighting of the gun in the circumstances presented by this incident [gave] rise to legitimate safety concerns and the removal of such a firearm was a reasonable precaution to protect the officers' safety.
>
> In concluding otherwise, the [suppression] court essentially found that the sighting of the gun did not give rise to legitimate safety concerns because [Appellant] was cooperative and did not make any movements towards the gun. However, the *Ross* [c]ourt clearly contemplated that the mere presence of a firearm during a traffic stop can reasonably lead an officer to believe his safety is at risk. . . .
>
> Here, Officer Torres saw a firearm sitting on the front seat of the car. He and his partner were standing on either side of the stopped car. The gun was within the reach of [Appellant]. In these circumstances, the officers clearly had legitimate reason to believe their safety may be at risk. To find otherwise would be to ignore the reality of our country, with the proliferation of guns on our streets and the fact that a significant percentage of murders of police officers occur[] when the officers are making traffic stops.

*Hawkins-Davenport*, 319 A.3d at 546-47 (citations and internal quotation marks omitted). *See also id.* at 547 ("To be clear, we also find that the removal of the gun seen in plain sight was a reasonable precaution to protect Officer Torres's legitimate concern for his and his partner's safety.").

The court likewise determined that "temporarily securing the gun in these circumstances, even if the firearm is lawfully possessed, is not a serious intrusion upon the sanctity of the person nor is it an arbitrary interference by law officers." *Id.* (citation

and internal quotation marks omitted). Rather, the panel explained, "it is a negligibly burdensome precaution taken so the officer may complete his mission safely." *Id.* (citation and internal quotation marks omitted). *See also id.* ("On balance, then, we find that any intrusion imposed by the seizure of a gun while police continue their traffic investigation must give way to the clear risk posed by a driver having access to a firearm during a traffic stop that is already known to teem with potential danger. … Although inherent in such a finding, we now make explicit that Officer Torres and other police officers in like situations do not need to ascertain that the driver illegally possesses the firearm observed in plain view during a lawful traffic stop before securing it for their protection.").

Addressing the suppression court's findings directly, the intermediate court disagreed that Officer Torres needed "any additional justification or cause to support the removal of the firearm beyond the fact that he was removing the firearm for the precautionary purpose of officer safety." *Id.* Rather, it found that "this safety justification is applicable to a firearm regardless of the possessor's licensure status. There is no doubt a firearm can be used to harm a police officer during a traffic stop whether it is legally possessed or not." *Id.* at 547-48. The court likewise found *Hicks*, relied upon by the lower court, to be "inapposite," as in that case, this Court "held that an officer cannot initiate an investigative stop based on an individual's mere possession of a firearm." *Id.* at 548. "Here, in contrast," the panel explained, the officers "did not stop [Appellant] on the basis that he was armed; rather, they stopped him because of a [] Vehicle Code violation." *Id.* It likewise emphasized that unlike prior cases, such as *Commonwealth v. Malloy*, 257 A.3d 142 (Pa. Super. 2021) (holding that the officer lacked reasonable suspicion to detain a defendant during an incidental traffic stop in order to investigate whether he was legally authorized to carry a firearm), "this case does not involve an allegation that the police

impermissibly extended the traffic stop to ascertain the status of [Appellant's] concealed carry licensure[.]" *Id.* at 549.

Based on the foregoing, and its finding that the statements made by Appellant to police about licensure "should not have been suppressed on the basis that they were tainted[,] *see id.* at 550, the panel reversed the suppression court's order and remanded the matter for further proceedings. *Id.* Appellant filed a petition for allowance of appeal to this Court.

## II. ISSUE AND STANDARD OF REVIEW

As indicated *supra*, we granted Appellant's petition to consider whether,

> [c]onsistent with the requirement that police may not conduct a frisk or seize a person's weapon without reasonable suspicion that he is "armed **and** presently dangerous," *Terry v. Ohio*, [392 U.S. 1 (1968),[8] ] police, during a lawful traffic stop, [may] frisk a car and seize a weapon in plain view where there is no evidence that the car's occupant is "presently dangerous" other than his mere possession of the weapon?

*Commonwealth v. Hawkins-Davenport*, 333 A.3d 300 (Pa. 2025) (*per curiam*) (emphasis in original). "In reviewing a ruling on a suppression motion, our standard of review is well settled: We are bound by the suppression court's factual findings if supported by the record; however, we review the suppression court's legal rulings *de novo.*" *Cooley,* 118 A.3d at 373. "If there is no meaningful dispute of fact, our duty is to determine whether the suppression court properly applied the law to the facts of the case, keeping in mind that the conclusions of law of the suppression court are not binding on this Court." *Commonwealth v. Price*, 284 A.3d 165, 169 (Pa. 2022).

## III. ANALYSIS

---

[8] *See Commonwealth v. Adams*, 205 A.3d 1195, 1203 (Pa. 2019) (explaining that "*Terry* marked the first case in which the United States Supreme Court determined that law enforcement officials may briefly detain an individual for questioning and pat down or 'frisk' the person based on facts that amount to less than probable cause to arrest.").

## A. RELEVANT LAW

The issue presented implicates the constitutional protection from unlawful searches and seizures, guaranteed by the Fourth Amendment to the United States Constitution, extended to the States via the Fourteenth Amendment, and independently enshrined in Article I, Section 8, of the Pennsylvania Constitution. These provisions provide, respectively, as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Constitution, Amend. IV.

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

PA Constitution, Art. I, § 8.

"Under both the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution, searches conducted in the absence of a search warrant are *per se* unreasonable, unless they satisfy one of the recognized exceptions to the warrant requirement." *Commonwealth v. Hunte*, 337 A.3d 483, 498 (Pa. 2025) (footnote omitted). *See also Jones v. United States*, 357 U.S. 493, 498 (1958) ("The decisions of this Court have time and again underscored the essential purpose of the Fourth Amendment to shield the citizen from unwarranted intrus[ions] into his privacy."); *Commonwealth v. Edmunds*, 586 A.2d 887, 897 (Pa. 1991) ("[A]s this Court has stated repeatedly in interpreting Article 1, Section 8, that provision is meant to embody a strong notion of privacy, carefully safeguarded in this Commonwealth for the past two centuries."). Unsurprisingly, for decades, courts have attempted to delineate the

exact parameters of these protections. The breadth of case law in this area is thus extensive.

Examining a narrow selection of search and seizure cases, all of which are relied upon by the parties, we begin our review with the High Court's seminal decision in *Terry*, *supra*. In that case, a police detective in plain clothes observed two men, one later identified as Terry, standing on a street corner in downtown Cleveland. *Terry*, 392 U.S. at 5. "He had never seen the two men before, and he was unable to say precisely what first drew his eye to them. However, he testified that he had been a policeman for 39 years and a detective for 35 and that he had been assigned to patrol this vicinity of downtown Cleveland for shoplifters and pickpockets for 30 years." *Id.* After observing the two men for an extended period of time, the officer became suspicious and approached the pair, who were now standing with a third man, although at "this point his knowledge was confined to what he had observed. He was not acquainted with any of the three men by name or by sight, and he had received no information concerning them from any other source." *Id.* at 7. He identified himself as a police officer and asked for their names. "When the men 'mumbled something' in response to his inquiries, [the officer] grabbed [] Terry, spun him around so that they were facing the other two … and patted down the outside of his clothing. In the left breast pocket of Terry's overcoat[,]" the officer felt a firearm, which he later recovered. *Id.*

Terry was arrested and subsequently filed a pre-trial motion to suppress. *Id.* In opposition, the "prosecution took the position that the[ men] had been seized following a search incident to a lawful arrest. The trial court rejected this theory," but nevertheless, denied the motion on the ground that the officer, "on the basis of his experience, had reasonable cause to believe that the defendants were conducting themselves suspiciously, and some interrogation should be made of their action." *Id.* at 7-8 (internal

quotation marks omitted). Terry was convicted of carrying a concealed weapon. *Id.* at 4, 8. After exhausting avenues for appeal on the State level, he sought certiorari, which was granted. *Id.*

Delivering the opinion of the Court, then-Chief Justice Warren observed that the case presented "serious questions concerning the role of the Fourth Amendment in the confrontation on the street between the citizen and the policeman investigating suspicious circumstances." *Id.* at 4. Ultimately, the High Court held "that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Id.* at 27. The officer, the Court explained, "need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id. See also id.* at 24 ("When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.").

Addressing the circumstances underlying the stop in *Terry*, the Court found it was unable to say that the officer's decision "to seize Terry and pat his clothing for weapons was the product of a volatile or inventive imagination, or was undertaken simply as an act of harassment[.]" *Id.* at 28. Rather, in its view, the record evidenced "the tempered act of a policeman who in the course of an investigation had to make a quick decision as to how to protect himself and others from possible danger, and took limited steps to do so." *Id.* Accordingly, and finding that the scope of the search in this case was confined "strictly

to what was minimally necessary to learn whether the men were armed and to disarm them once he discovered the weapons[,]" the Court concluded "that the revolver seized from Terry was properly admitted in evidence against him." *Id.* at 30.

The *Terry* decision has become a fixture in search-and-seizure case law, relied upon and frequently cited by courts, both in this Commonwealth, and, *inter alia*, in other jurisdictions. For example, the United States Supreme Court later "rejected the view that the validity of a *Terry* search depends on whether the weapon is possessed in accordance with state law." *Michigan v. Long*, 463 U.S. 1032, 1052, n.16 (1983) (citation omitted). The High Court also found *Terry* controlled when determining, *inter alia*, that upon a lawful traffic stop, an officer's request that a driver exit the automobile and subsequent frisk of the driver's person was permissible under Fourth Amendment, notwithstanding the fact that law enforcement had no cause to suspect foul play from the defendant at time of the stop. *Pennsylvania v. Mimms*, 434 U.S. 106, 108-110 (1977). *See also Hicks*, *supra*, 208 A.3d at 921 ("A cornerstone of modern law enforcement methods, 'stop and frisk' is a practical tool designed to encourage the effective investigation and prevention of crime, while maintaining a balance between the constitutionally protected privacy interests of the individual and the needs and safety of law enforcement personnel.").

In other post-*Terry* cases, courts have gone to great lengths to outline the appropriate balance between individual rights and officer safety. For example, in *United States v. Robinson,* 846 F.3d 694 (4th Cir. 2017) (*en banc*), the Fourth Circuit held that "an officer who makes a lawful traffic stop and who has a reasonable suspicion that one of the automobile's occupants is armed may frisk that individual for the officer's protection and the safety of everyone on the scene." *Robinson*, 846 F.3d at 696 (citing *Mimms*, *supra*). In so finding, the court explained that "[t]he Fourth Amendment does not require ... police officers [to] take unnecessary risks in the performance of their duties. . . . [I]t

is also inconsequential that the passenger may have had a permit to carry the concealed firearm. The danger justifying a protective frisk arises from the combination of a forced police encounter and the presence of a weapon, not from any illegality of the weapon's possession." *Id.* (internal citations and quotation marks omitted). Similarly, in *Commonwealth v. Lagana*, 537 A.2d 1351 (Pa. 1988), we found that the responding officer had reason to believe that he was searching for a suspect who was armed and potentially dangerous, which required him "to act swiftly to apprehend an individual reported to be in possession of a gun who was standing on a busy street corner and was a potential threat to the safety of the officer and other persons in the area." *Lagana*, 537 A.2d at 1354. Under those circumstances, we explained, "the officer was not required to ask questions first and possibly risk being shot." *Id. See also Adams v. Williams*, 407 U.S. 143, 148 (1972) ("[T]he policeman's action in reaching to the spot where the gun was thought to be hidden constituted a limited intrusion designed to insure his safety, and we conclude that it was reasonable.").

More recently, this Court addressed the protection from unlawful searches and seizures in *Commonwealth v. Saunders*, 326 A.3d 888 (Pa. 2024) and *Hicks, supra*. In *Saunders*, we held that the seizure of a firearm during a traffic stop was lawful under the plain view exception to the warrant requirement. *See Saunders*, 326 A.3d at 892 (noting that before the seizure of the firearm, Saunders was removed from the vehicle and when questioned, admitted he did not have a permit for the gun). In making this pronouncement, we rejected Saunders' argument that his privacy interest in the vehicle was invaded when the officer "trespassed" into it to seize the gun, finding, at most, that there was a "a *de minimis* intrusion on Saunders's expectation of privacy in the vehicle[,]" as the officer's "intrusion was narrowly circumscribed to address and neutralize the unsecured gun on the floor of the open car." *Id.* at 904-05.

Several years earlier, we decided *Hicks*, which involved a police-initiated investigative stop after law enforcement received information that Hicks was seen carrying a firearm. It was later determined that Hicks had a permit for the gun, but he was still arrested on, *inter alia*, suspicion of driving under the influence. Ultimately, this Court, in relevant part, rejected as erroneous the Superior Court's reliance on *Commonwealth v. Robinson*, 600 A.2d 957, 959 (Pa. Super. 1991) for the proposition that "possession of a concealed firearm by an individual in public is sufficient to create a reasonable suspicion that the individual may be dangerous, such that an officer can approach the individual and briefly detain him in order to investigate whether the person is properly licensed." *Hicks*, 208 A.3d at 947 (citation omitted). "This holding facially contravenes established law as set forth in *Terry* and its progeny, demands no suspicion of criminal activity—let alone individualized suspicion—and countenances a sweeping and unjustified expansion of the authority of law enforcement to seize persons upon the basis of conduct that, standing alone, an officer cannot reasonably suspect to be criminal." *Id.*

In all, these decisions constitute instructive examples of the ways in which courts have balanced the "fundamentally individual right—the right of each individual to be let alone[,]" *see id.* at 937 (citation and internal quotation marks omitted), against legitimate and weighty concerns for the safety of those tasked with policing our neighborhoods. *See Terry*, 392 U.S. at 23 ("Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties."). While these same interests are at the forefront here, none of the above-cited cases are on all fours with the instant matter. Consequently, we must take a closer look at the parties' arguments.

## B. PARTIES' ARGUMENTS

Premising his argument exclusively on the Fourth Amendment, *see* Appellant's Brief at 8 n.2 ("Article 1, Section 8 of the Pennsylvania Constitution is coextensive with

the Fourth Amendment in this area"), Appellant contends that in reversing the suppression court's ruling, the Superior Court "improperly collapsed the two-pronged 'armed and dangerous' test into a single element: armed." *Id.* at 9. In doing so, Appellant argues, the intermediate court reduced the Supreme Court's carefully chosen "armed and dangerous" language to mere surplusage. *Id.* at 9-10. According to Appellant, the court also failed to account for the fact that due to changes in the law allowing citizens to carry firearms in public, "it is no longer reasonable to assume that everyone who exercises their constitutional right to possess a handgun in public is inclined to shoot a police officer." *Id.* at 10.

Addressing the particular circumstances of this case, Appellant complains that the officer's "intrusion" into his car was a search under the Fourth Amendment, *see id.* at 11 (citing *United States v. Jones*, 565 U.S. 400, 404 (2012) (explaining that it is "beyond dispute that a vehicle is an 'effect' as that term is used in the [Fourth] Amendment")), and at the time of the seizure, the officer had no reason to suspect that he possessed the gun illegally. *See also id.* at 13 (asserting that while the degree of trespass into his vehicle was similar to that in *Saunders*, "the invasiveness of the seizure is considerably more serious" due to the officer's lack of knowledge concerning the lawfulness of the possessed weapon).

Likewise, Appellant asserts, "police had no reason to think that he posed them any danger[,]" as he was cooperative during the stop, did not try to conceal the firearm, and was "not suspected of a violent crime[.]" *Id.* at 14. He insists that neither this Court nor the United States Supreme Court has "endorsed a search, even a limited one designed to protect police, without some evidence that the subject of the search was dangerous beyond the mere presence of a weapon in plain view", *see id.* at 16, and maintains that even though a legally possessed firearm could be used to harm a police officer, it is still

"a step too far to conclude, as the Superior Court did, that a gun always means danger, regardless of a person's cooperation, honesty, or demeanor toward police." *Id.* at 22 (emphasis in original omitted). Appellant further warns that allowing a search under these circumstances would force "gun owners to sacrifice their rights under the Fourth Amendment to exercise their rights under the Second."[9] *Id.* at 23. *See also id.* at 26 (conceding that officer safety is a "legitimate and weighty" interest but maintaining that in this case, the Superior Court failed to "appropriately balance the officer's interest in his own safety against [Appellant's] constitutional right to be free of unreasonable searches and seizures"); *id.* at 32-33 (hypothesizing laws that could be enacted to ensure officer safety without compromising a citizen's constitutional rights, and claiming the current absence of such laws meant that Appellant's possession of a firearm did not justify the officer's actions).

For its part, the Commonwealth, supported by Amicus Curiae, the Office of the Attorney General of Pennsylvania ("OAG"),[10] insists that the officers' seizure of the firearm

---

[9] *See* U.S. Constitution, Amend. II ("A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.").

[10] The OAG reiterates many of the same arguments offered by the Commonwealth. In particular, the OAG maintains that *Terry* does not conflict with the Second Amendment and "remains sound constitutional law that fully justified the officers' seizure of [Appellant's] gun." *Amicus* Brief at 8. *See also id.* at 12 (explaining that "the point of *Terry* is to allow police to investigate without fear of violence, regardless of whether weapon is lawfully possessed" (internal citation and quotation marks omitted)). Along these lines, the OAG emphasizes the potential dangers to traffic stops, *see id.* at 9-13, and posits that "[i]f temporary disarming were not allowed, the danger of car stops would increase enormously." *Id.* at 15.

The OAG also criticizes Appellant's interpretation of *Terry*, opining that the High Court's decision "does not require police to gamble with their lives unless they can somehow show that a stopped person intended to shoot them." *Id.* at 16. It further emphasizes that no case stands for the proposition that the High Court carefully selected the words "armed and dangerous" to convey that "armed is not the same as dangerous[.]" (continued…)

was consistent with *Terry* and its progeny. For instance, the Commonwealth observes that this case "closely resembles" *Mimms*, *supra*, where the United States Supreme Court found that the officer's observation of a bulge in Mimms' jacket permitted him to conclude that Mimms was armed and thus, posed a danger to the safety of the officer. Commonwealth's Brief at 10-11. *See also id.* at 15 (asserting that an officer unexpectedly coming face to face with a stranger who has a deadly weapon is the "very sort of exigency that *Terry* was designed to address").

On the other hand, the Commonwealth challenges Appellant's reliance on *Hicks*, *supra*, which, as noted, involved an investigative stop that was deemed unlawful due to the fact that it was solely based on the observation of a man with a gun in his waistband. *See id.* at 16. The Commonwealth concedes that here, had Appellant not committed a traffic offense, "the police would have had no right to stop him regardless of whether he was carrying a firearm." *Id.* at 17. The equation, however, changes "when an officer enforces the law by making a legitimate stop[.] … It is no longer possible to allow the driver to go about his business; the officer must interact with him at close quarters and detain him until the matter at issue is resolved." *Id.* (emphasis in original omitted).

The Commonwealth likewise questions how Appellant "has standing to litigate a Second Amendment claim given that he admit[ted to] illegally carrying his gun without a license and raise[d] no challenge to the constitutionality of the underlying state law." *Id.*

---

*Id.* at 17. Rather, the OAG contends, an officer "may frisk for weapons if a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 16 (citation and internal quotation marks omitted). In this regard, it insists that "any reasonably prudent officer finding a gun during a traffic stop is warranted in believing there is danger." *Id.* To wit, the OAG highlights that "[Appellant's] argument that there was 'no evidence' of danger does not deny his *capacity* to use the deadly weapon within his easy reach, but relies on the fact that he himself was cooperative[.]" *Id.* at 17 (emphasis in original)). *See also id.* at 21-24 (rejecting Appellant's reliance on case law which, in its view, does not support a finding that "armed" and "dangerous" are "unrelated concepts").

at 23 n.13 (emphasis in original omitted). This notwithstanding, the Commonwealth avers that "to the extent that such a right may be imagined, any interference with it was minimal." *Id.* at 24. This is because the officer's protective action in securing the firearm in plain sight, "which was far less invasive than a frisk" the officer would have been justified in performing, "surely passed constitutional muster." *Id.* at 27. *See also id.* at 29 ("The officers could hardly be expected to focus on such mundane matters as whether [Appellant's] paperwork was in order while preoccupied with whether they might be staring down the barrel of a gun an instant later. Removing the gun was essential so that the stop could proceed in a safe and orderly manner.").[11]

## C. DISCUSSION

The Fourth Amendment to the United States Constitution protects citizens from unreasonable searches and seizures. However, "[a]s we have previously observed '[o]ur constitutional safeguards' against unreasonable searches and seizures 'do not require an officer to gamble with his life.'" *Int. of T.W.*, 261 A.3d 409, 421 (Pa. 2021) (citing *Commonwealth v. Morris*, 644 A.2d 721, 724 (Pa. 1994)). As articulated in *Ross*, *supra*:

> It bears emphasizing that balancing the constitutional rights of motorists, the public protection objectives, and police officer safety is difficult, especially in the context of rapidly evolving traffic stops. One particular concern for officers during a traffic stop is the proliferation of guns, including the substantial increase in the number of people possessing firearms, the rise in mass shootings, and the ability to carry a concealed weapon in

---

[11] Appellant briefly responds to the aforementioned arguments, insisting, *inter alia*, that: (1) "Pennsylvania's firearm regulation scheme relies on the assumption that gun owners can be trusted not to be dangerous except when needed for self-defense[;]" (2) "the *Mimms* court's discussion of the frisk was *dicta* and thus not binding on this Court[;]" (3) "the [H]igh [C]ourt has never held that a frisk was justified based on the presence of a weapon alone[;]" (4) "a frisk becomes unreasonable where it is based on nothing more than the exercise of Second Amendment rights[;]" (5) "[p]olice would have been justified in entering the car and seizing the gun if they had probable cause that it was contraband[,] … [b]ut they had no such information here[;]" and (6) "[h]is strong interest in protecting his private space and property did not disappear simply because police later discovered that he lacked a permit." Appellant's Reply Brief at 2, 4, 6, 10, 12-13.

vehicles in Pennsylvania. Clearly, neither the United States Constitution nor the Pennsylvania Constitution require officers to gamble with their personal safety during traffic stops. Therefore, in the context of traffic stops, police officers may take reasonable precautions when the circumstances give rise to legitimate safety concerns.

*Ross,* 297 A.3d at 797-98 (footnote and internal citations omitted). These very concerns were at the forefront in *Terry* and later, as detailed *infra*, *Mimms*, where the United States Supreme Court held that an officer, as a matter of course, may order a driver to step out of the vehicle during a lawful traffic stop. *See, e.g.,* Appellant's Brief at 34 (acknowledging that "even without reasonable suspicion of dangerousness, an officer may ensure their own safety by controlling the motorist's movements or by ordering them out of the car").

Here, Officers McCabe and Torres conducted a lawful traffic stop after noticing a vehicle travelling with an inoperable driver's side brake light. Within a minute of exiting their patrol car, the officers made contact with the driver, Appellant, and Officer Torres, who was positioned alongside the passenger's side of the vehicle, observed through an open window, a gun, lying in plain view on the front passenger's seat. Within seconds, the officer, in lieu of ordering Appellant out of the vehicle, which Appellant concedes would have been constitutionally permissible under these circumstances, *see id.*, recovered the firearm for his and his partner's "safety[,]" *see* N.T., 2/21/23, at 23.

Initially, we acknowledge that the aforementioned interaction between Appellant and the officers is not equivalent to a traditional *Terry* stop. However, traffic stops, "resemble, in duration and atmosphere, the kind of brief detention authorized in *Terry*[.]" *Arizona v. Johnson*, 555 U.S. 323, 330 (2009) (quotation marks omitted). "[A] relatively brief encounter, a routine traffic stop is more analogous to a so-called '*Terry* stop' ... than to a formal arrest." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (alterations in original; some quotation marks omitted). As the U.S. Supreme Court explained in *Adams*, *supra*: the purpose of a limited *Terry* search "is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence, and thus the frisk for

weapons might be equally necessary and reasonable, whether or not carrying a concealed weapon violated any applicable state law." *Adams*, 407 U.S. at 146. *See also id.* ("So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose." (footnote omitted)). In this regard, and cognizant of the narrow question upon which we granted allocatur, explicitly implicating the *Terry* decision, we find that, while the underlying facts differ from those presented in that case, the officers' actions in the instant matter do not run afoul of the *Terry* decision.

In so finding, we look to *Mimms*, and its application of *Terry*, which, while not dispositive, is highly instructive. In that case, two officers observed Mimms driving with an expired license plate. The officers stopped the vehicle for the purpose of issuing a traffic summons and once they approached, asked Mimms to "step out of the car and produce his owner's card and operator's license." *Mimms*, 434 U.S. at 107. Mimms complied, at which point one of the officers noticed a large bulge under Mimms' sports jacket. "Fearing that the bulge might be a weapon, the officer frisked [Mimms] and discovered in his waistband a .38-caliber revolver loaded with five rounds of ammunition." *Id.* Mimms "was immediately arrested and subsequently indicted for carrying a concealed deadly weapon and for unlawfully carrying a firearm without a license. His motion to suppress the revolver was denied; and, after a trial at which the revolver was introduced into evidence, [Mimms] was convicted on both counts." *Id.*

On appeal, the Superior Court affirmed the conviction, but this Court reversed, opining that the officer's "policy of ordering all drivers stopped for traffic violations out of their vehicles" was "an indiscriminate procedure" that violated the Fourth Amendment, thus necessitating the suppression of the fruits obtained as a result thereof. *Commonwealth v. Mimms*, 370 A.2d 1157, 1161 (Pa. 1977). Ultimately, the U.S.

Supreme Court granted certiorari in the matter and later, issued an order reversing our Court's judgment.

In disagreeing with this Court's conclusion, the High Court observed that per *Terry*, "[t]he touchstone" of any analysis under the Fourth Amendment is "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Mimms*, 434 U.S. at 108-09 (quoting *Terry*, 392 U.S. at 19). After finding the officer's order that Mimms' exit the vehicle to be constitutionally permissible, *see id.* at 111 ("What is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety" (footnote omitted)), the Court turned to "the propriety of the search once the bulge in the jacket was observed." *Id.* The High Court determined that this answer was controlled by *Terry*: "The bulge in the jacket permitted the officer to conclude that Mimms was armed and thus posed a serious and present danger to the safety of the officer. In these circumstances, any man of reasonable caution would likely have conducted the pat down." *Id.* at 112 (internal quotation marks omitted).

Presently, Appellant urges this Court to reject *Mimms* as, *inter alia*, distinguishable on account of the fact that the weapon recovered from Mimms' person was concealed under his sports coat. Importantly, however, there is no suggestion that the Court premised its finding of reasonableness on the fact that Mimms' jacket obscured the weapon. Nor is there any indication that Mimms acted in a strange or evasive manner. Rather, it was ostensibly the forced stop and the *potential* existence of a weapon that created a "serious and present danger to the safety of the officer." *Id.* Appellant's attempt to distinguish this case in light of differences that were seemingly insignificant to the *Mimms* Court's analysis is thus unpersuasive.[12]

---

[12] We likewise reject Appellant's attempt to characterize the *Mimms* Court's discussion of the frisk as mere *dicta*. The opinion itself indicates that the Court was tasked with (continued…)

The *Terry* decision was also instrumental in the New Mexico Supreme Court's disposition of a case involving materially similar circumstances. In *State v. Ketelson*, 257 P.3d 957 (N.M. 2011),[13] officers stopped a vehicle with expired temporary tags. As the officers approached, one saw a black nine-millimeter handgun lying on the back seat floorboard. *Ketelson*, 257 P.3d at 959. One officer proceeded to ask the passenger, Gregory Ketelson, to exit the vehicle, while the other officer retrieved the firearm. *Id.* Following the retrieval, Ketelson signed a card consenting to the search and admitted that the firearm belonged to him. *Id.* at 960. It was later revealed that Ketelson had a prior felony conviction and as a result, he was arrested and charged as a felon in possession of a firearm. *Id.*

Prior to trial, Ketelson moved to suppress the firearm and statements made to the police regarding its ownership. *Id.* The district court granted suppression and on direct review, the court of appeals affirmed. *Id.* at 960-61. The New Mexico Supreme Court later granted the State's petition for writ of certiorari to consider "whether it is unreasonable under the state and federal constitutions for a police officer to remove a visible firearm from a vehicle subject to a lawful traffic stop." *Id.* at 961.

In reversing the grant of suppression, the *Ketelson* court first considered the legality of the seizure under *Terry* and the Fourth Amendment. The court found:

> *Terry* does not require certainty on the part of the officer that a suspect is armed and dangerous in order to conduct a limited protective search; rather, it requires only that the suspect "may" be armed and dangerous. Critically, in this case, the gun was visible to the officers during the traffic stop, and thus the officers were certain that [Ketelson] had access to a firearm.

resolving two questions, the second of which was "the propriety of the search once the bulge in the jacket was observed." *Id.* at 111.

[13] "While it is a truism that decisions of sister states are not binding precedent on this Court, they may be persuasive authority[.]" *Commonwealth v. Nat'l Bank & Tr. Co. of Cent. Pa.*, 364 A.2d 1331, 1335 (Pa. 1976).

Additionally, neither [Ketelson] nor the driver was restrained, and thus the risk that one of them would access the firearm was especially potent. Under such circumstances, [the officer] could constitutionally remove the firearm from the vehicle because he possessed a reasonable belief based on specific and articulable facts which warranted him in believing that [Ketelson] was armed and thus posed a serious and present danger to [his] safety.

*Id.* at 963 (internal citations omitted).

Recognizing that, similar to this Commonwealth, New Mexico's constitution offers greater protections than its federal counterpart, the court focused on concepts of reasonableness and explored the competing interests at stake when considering the propriety of the stop under Article II, Section 10 of the New Mexico Constitution.[14] Ultimately, the *Ketelson* court concluded that "[t]he officer's removal of the firearm from the vehicle was at most a minimal intrusion upon a personal possessory interest," and "the need for officer safety outweigh[ed] the minimal intrusion upon a personal possessory interest occasioned by the officer's retrieval of the firearm from the vehicle[.]" *Id.* at 965. Thus, the court explained, under the state constitution, it was reasonable for the "officer to temporarily take possession of a visible firearm during a lawful traffic stop[,]" as it remained "mindful of the grave need for officer safety in the midst of the dangers and uncertainties that are always inherent in traffic stops." *Id.* Thus, it concluded "that removing [Ketelson's] firearm from the vehicle in order to ensure that it was beyond the reach of any of the occupants during the stop was a reasonable and minimal intrusion, which does not outweigh legitimate concerns of officer safety." *Id.*

---

[14] Like Article 1, Section 8, this Article of the New Mexico Constitution provides that:

The people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures, and no warrant to search any place, or seize any person or thing, shall issue without describing the place to be searched, or the persons or things to be seized, nor without a written showing of probable cause, supported by oath or affirmation.

N.M. Constitution, Art. II, § 10.

The analyses in *Mimms* and *Ketelson* are compelling.  Conversely, we reject as inapposite Appellant's reliance on *Hicks*, *supra*.  As noted, in that case, we held that the *Terry* stop, based solely on law enforcement's knowledge of a firearm concealed on the defendant's person, was unlawful.  In reaching this decision, the *Hicks* Court was careful to indicate that its holding was "confined to the lawfulness of seizures based solely upon the possession of a concealed firearm—conduct that is widely licensed and lawfully practiced by a broad range of people."  *Hicks*, 208 A.3d at 945.

We stress that here, police initiated a lawful traffic stop after observing a vehicle driving with an inoperable brake light.  Unlike in *Hicks*, where the premise of the forced encounter was the observation of a man in possession of a gun only, *see id.* at 922, at the time of the stop in this case, officers were wholly unaware that Appellant was sitting within arm's length of an unsecured firearm until they made contact with him.  *See* N.T., 2/21/23, at 20.  Stated plainly, it was the traffic violation, and not the possession of the firearm, that gave rise to the stop.  This significant distinction places this case outside the reach of the *Hicks* holding.

Nor are we persuaded by the cases Appellant cites from other jurisdictions, such as *State v. Henage*, 152 P.3d 16 (Idaho 2007).  There, the Idaho Supreme Court held that a *Terry* frisk was not justified based solely on a vehicle passenger's "nervous" behavior and his admission that he had a knife.  *Id.* at 23.  Further elaborating, the court explained that "[w]eapons searches are not justified by an officer's subjective feeling, especially when that feeling is not particularized to a particular individual in a specific fact situation."  *Id.*  Rather, it opined, "the court must find that the officer has presented specific facts that can be objectively evaluated to support the conclusion that the subject of the intended search posed a potential risk."  *Id.*  Notably, the officer in *Henage* was acquainted with the passenger, having had several prior encounters with him that were

never "combative." *Id.* at 22. This fact, among others, was emphasized by the Idaho Court of Appeals in a subsequent decision, where it distinguished *Henage* and found that a *Terry* frisk was proper. *See State v. Saucedo*, 2025 WL 351306, at *3 (Idaho Ct. App. 2025) (unpublished) ("Unlike in *Henage*, [the officer] had no known previous interactions with Saucedo such that the officer could be assured that Saucedo did not pose a threat.").

In another case cited by Appellant, *State v. Serna*, 331 P.3d 405 (Ariz. 2014), the Arizona Supreme Court stressed that *Terry* "requires that a suspect be 'armed *and* presently dangerous.'" *Id.* at 410 (emphasis in original). Pertinently, the interaction with the defendant in *Serna* was a consensual encounter on the street and was initiated despite officers having no evidence of wrongdoing. *Id.* at 406-07. It was only when speaking to the defendant that the officers observed a bulge on his waistband. *Id.* at 407. These facts were underscored by the *Serna* Court when finding *Mimms* distinguishable. "[T]here, the police already had probable cause to believe that Mimms had committed at least one offense" and "approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile." *Id.* at 411 (citations omitted). *See also id.* (noting that "carrying a concealed weapon was itself a criminal act in Pennsylvania" and here, "the State presented no evidence that the police had either probable cause or reasonable suspicion that Serna was engaged in criminal activity when Officer Richey ordered him to put his hands on his head").

*Northrup v. City of Toledo Police Dep't*, 785 F.3d 1128 (6th Cir. 2015), is likewise distinguishable. *Northrup* is more akin to *Hicks*, *supra*, as it involved a stop and detention that was based solely on the officer's knowledge that Northrup was carrying a gun on his holster when walking down the street, a legal act in Ohio. *See id.* at 1130. *See also United States v. Richmond*, 924 F.3d 404, 415 (7th Cir. 2019) (explaining that in *United States v. Leo*, 792 F.3d 742 (7th Cir. 2015), another case cited by Appellant to support

his position, the court "held the backpack search was not supported by reasonable suspicion because the defendant could not get 'immediate control' of a gun—while handcuffed—outside his reach").

These distinctions notwithstanding, it is beyond dispute that there are inherent dangers associated with traffic stops: "we recognized that investigative detentions involving suspects in vehicles are especially fraught with danger to police officers[,]" *Long*, 463 U.S. at 1047; "[r]egrettably, traffic stops may be dangerous encounters[,]" *Maryland v. Wilson*, 519 U.S. 408, 413 (1997); "we have specifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile. … We are aware that not all these assaults occur when issuing traffic summons, but we have before expressly declined to accept the argument that traffic violations necessarily involve less danger to officers than other types of confrontations. Indeed, it appears that a significant percentage of murders of police officers occurs when the officers are making traffic stops[,]" *Mimms*, 434 U.S. at 110 (internal citations and quotation marks omitted); "[a]ccording to one study, approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile[,]" *Adams*, 407 U.S. at 148 n.3.

Likewise, firearms are unquestionably dangerous, as they are, by their very nature, lethal weapons, regardless of whether they are legally possessed. As we explained in *Int. of T.W.*, *supra*, "It may not be immediately apparent that the possession of a weapon, such as a firearm for example, is illegal contraband. A *Terry* frisk then would serve little purpose if police officers could only remove objects which they reasonably suspect to be a weapon if it was immediately apparent that possession of the weapon was illegal." *Int. of T.W.*, 261 A.3d at 422. *See also Terry*, 392 U.S at 23-24 ("American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of

these deaths and a substantial portion of the injuries are inflicted with guns and knives." (footnote omitted)). Similarly, the United States Supreme Court has held, within the meaning of the federal bank robbery statute, that an unloaded handgun is a "dangerous weapon[,]" as a gun is, *inter alia*, "an article that is typically and characteristically dangerous; the use for which it is manufactured and sold is a dangerous one, and the law reasonably may presume that such an article is always dangerous even though it may not be armed at a particular time or place." *McLaughlin v. United States*, 476 U.S. 16, 17 (1986). *See also Florida v. J.L.*, 529 U.S. 266, 272 (2000) ("Firearms are dangerous, and extraordinary dangers sometimes justify unusual precautions.").

We find that the facts available to Officer Torres at the moment of the seizure, *i.e.*, the unexpected sight, through an open car window, of an unsecured firearm in plain view on the passenger's seat during a legal vehicle stop, is the kind of circumstance that would warrant a "reasonably prudent man" to believe "that his safety or that of others was in danger." *Terry*, 392 U.S. at 27. *See also* Commonwealth's Brief at 29 ("Removing the gun was essential so that the stop could proceed in a safe and orderly manner[,]" as "[t]he officers could hardly be expected to focus on such mundane matters as whether defendant's paperwork was in order while preoccupied with whether they might be staring down the barrel of a gun an instant later" (footnote omitted)). To hold otherwise would be to ignore the realities of traffic stops and the dangers these type of tense encounters often pose to law enforcement and civilians alike. It would also require this Court to interpret *Terry* as narrowly permitting a frisk only when the offender's actions *alone* demonstrate that he is armed *and* dangerous, *see* Appellant's Brief at 2 (emphasizing that during the stop, he "did not make any furtive movements, and did not attempt to hide his gun"), without accounting for the other circumstances attendant to the stop and seizure. This we cannot do. As previously observed: "the risk of a violent encounter in a traffic-stop

setting stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop." *Johnson*, 555 U.S. at 331 (internal quotation marks omitted). *See also Mimms,* 434 U.S. at 112 ("The bulge in the jacket permitted the officer to conclude that Mimms was armed and thus posed a serious and present danger to the safety of the officer."); *Commonwealth v. Revere*, 888 A.2d 694, 707 (Pa. 2005) ("[T]he U.S. Supreme Court has explained that the 'central requirement' and the 'touchstone' of the Fourth Amendment is reasonableness. Reasonableness ... is measured in objective terms by examining the totality of the circumstances." (citations and some internal quotation marks omitted)).

## IV. CONCLUSION

For the foregoing reasons, we decline to adopt Appellant's strained interpretation of our search-and-seizure jurisprudence and instead hold that the panel below appropriately concluded that when a police officer sees a firearm in plain view and within reach of the driver during a lawful traffic stop, the officer may "remove that firearm from the vehicle before ascertaining whether the driver has a license to carry the gun so that the officer may proceed with the traffic stop safely." *Hawkins-Davenport*, 319 A.3d at 550. We therefore affirm the Superior Court's order reversing the suppression court's grant of suppression.

Chief Justice Todd and Justices Donohue, Dougherty, Wecht, Brobson and McCaffery join the opinion.